Lysander W. Tulleys, appellant, v. Charles B. Keller et al., appellees.

Filed May 22, 1895.   No. 7240.

1. **Corporations:** Officers: Use of Name as Trustee.   Where the president of a loan company consented that securities in the nature of trust deeds should be made to himself, described as trustee, he thereby gained no right to use such designation to the injury of the company of which he was president and which was in fact the beneficiary named or contemplated in such trust deeds.

2. **Equity Jurisdiction.**   One who submits to the determination of a court of equity his claim of a right to employ the designation of himself as trustee to the disadvantage of the beneficiary, and prays the judicial recognition and enforcement of such right, has no cause to complain if such court having taken jurisdiction of the subject-matter for said purpose administers complete relief as between all the parties to such litigation.

3. **Loan Companies:** Corporate Officers: Use of Name as Trustee.   The facts in this case stated, and *held* to justify the decree entered in the district court.

APPEAL from the district court of Douglas county. Heard below before FERGUSON, J.

*Breckenridge & Breckenridge,* for appellant, cited: *Holden v. New York & Erie Bank,* 72 N. Y., 286; *Myers v. Ross,* 3 Head [Tenn.], 59; *Hart v. Farmers & Merchants Bank,* 33 Vt., 252; *National Security Bank v. Cushman,* 121 Mass., 490; *Bank of New Milford v. Town of New Milford,* 36 Conn., 93; *Central Nat. Bank v. Levin,* 6 Mo. App., 543; *Toll Bridge Co. v. Betsworth,* 30 Conn., 391; *New Hope & Delaware Bridge Co. v. Phenix Bank,* 3 N. Y., 166; *Trenton Banking Co. v. Woodruff,* 1 Green Ch. [N. J.], 128; *Porter v. Bank of Rutland,* 19 Vt., 410; *Fulton Bank v. New York & Sharon Canal Co.,* 4 Paige Ch. [N. Y.], 136; *Mechanics Bank v. Schaumburg,* 38

Mo., 228; *Village of Port Jervis v. First Nat. Bank*, 96 N. Y., 550; *Quincy Coal Co. v. Hood*, 77 Ill., 68; *New England Car Spring Co. v. Union India Rubber Co.*, 4 Blatch. [U. S.], 1.

*Charles B. Keller, contra,* cited: *Walters v. Anglo-American Mortgage & Trust Co.*, 50 Fed. Rep., 316; *Walker v. Anglo-American Mortgage & Trust Co.*, 72 Hun [N. Y.], 334; *Glass v. Tipton, Tetersburg & Berlin Turnpike Co.*, 32 Ind., 378; *Enewold v. Olsen*, 39 Neb., 59; *Meneely v. Meneely*, 62 N. Y., 427; *Smith v. Plank Road Co.*, 30 Ala., 650; *Probasco v. Bouyon*, 1 Mo. App., 241; *Caswell v. Davis*, 58 N. Y., 223; *Holmes v. Holmes, Booth & Atwood Mfg. Co.*, 37 Conn., 278; *Glenn & Hall Mfg. Co. v. Hall*, 61 N. Y., 226; *Koehler v. Dodge*, 31 Neb., 329; *Fitzgerald v. Fitzgerald & Mallory Construction Co.*, 41 Neb., 374.

RYAN, C.

This action was brought in the district court of Douglas county by appellant against the appellees for an injunction restraining the defendants from interfering with the business of L. W. Tulleys, both as an individual and as trustee. It was likewise sought to prevent defendant's use of the name of L. W. Tulleys and of the name of Burnham, Tulleys & Co. The defendants Keller and Weldon were joined with the Anglo-American Mortgage & Trust Company simply because one, as its attorney at law, and the other, as its manager, was acting in its behalf in the matters of which complaint was made. By its answer, in the nature of a cross-petition, the Anglo-American Mortgage & Trust Company prayed that plaintiff L. W. Tulleys might be enjoined from advertising and doing business as "successor to L. W. Tulleys, trustee," and from interference with the right of such defendant to the use of the designation "L. W. Tulleys, trustee," and that plaintiff

might be restrained from the use of the above designation of himself in respect to papers, securities, and titles taken by plaintiff for which funds loaned by the mortgage and trust company had been used while plaintiff was president of said defendant. There was also in the said answer a prayer that plaintiff might be enjoined from interfering with said defendant's use of the firm name of Burnham, Tulleys & Co. in respect to commission notes and mortgages which had been taken in the name of said firm, but which in reality belonged to said mortgage and trust company, and that in such cases as plaintiff while president of said mortgage and trust company had appropriated its funds to payments for foreclosing commission mortgages in which L. W. Tulleys as a member of the firm of Burnham, Tulleys & Co. had or claimed an interest. There was also a prayer that a commissioner might be appointed by the court to make such conveyances as should be found necessary in case plaintiff should fail to execute them within such time as should by the court be fixed for that purpose. There was also a prayer for general equitable relief. It is not attempted to set out or epitomize the pleadings, for thereby would be involved much needless repetition. To avoid misapprehension, however, it is perhaps necessary to state that there was in an answer of all the defendants a denial of the averments of the petition, and that, by reply, a like issue was joined upon each of the averments of the answer. On final hearing, the plaintiff was denied relief and the prayer of the mortgage and trust company was for the most part granted. While this case has been pending in this court there has been filed an opinion upon application for an order for an additional supersedeas bond. ( *Vide Tulleys v. Keller*, 42 Neb., 788.)

For some time prior to June 1, 1888, the firm of Burnham, Tulleys & Co., of which firm plaintiff was a member, was engaged in loan business, taking only real estate security. Its principal office was at Council Bluffs, Iowa,

where its membership was A. C. Burnham, L. W. Tulleys, and J. N. Brown. It had a branch office at Sioux Falls, South Dakota, where, in addition to the above membership, there was included J. V. McDowell. For such sums as were loaned bonds were taken, payable, principal and interest, to C. K. Hesse. To secure each bond a trust deed of the real property offered as security was required to be executed to " L. W. Tulleys, trustee." Where a commission for effecting a loan was not paid in cash it was secured by a mortgage subject to the above described deed of trust, the firm of Burnham, Tulleys & Co. being named as the mortgagee. Mortgages of this class were throughout this case described as commission or second mortgages. It was claimed by the plaintiff on the argument that the business of Burnham, Tulleys & Co. during the years 1886, 1887, and up to its discontinuance, about June 1, 1888, was very prosperous. This was denied by the defendant. It is difficult from the evidence before us to determine satisfactorily what was, in fact, the financial condition of Burnham, Tulleys & Co. at the date last above mentioned. There is found in the bill of exceptions a letter of Burnham, Tulleys & Co., of date November 13, 1886, addressed to P. L. Johnson at Hastings, Nebraska, in which occurs this language: " We may need $5,000 to $10,000 more money from C. B. Nat'l Bank, but, as we have already borrowed there, in order to get a further loan we will have to use different names. If agreeable, send us a note similar to the enclosed, signed by your brother and yourself, but make out the amount on a blank you have in Hastings. We send the enclosed as a sample. It looks better to have two names. We will guaranty the note and hold you harmless as to its payment. Your early attention will oblige," etc. In a letter of Burnham, Tulleys & Co., addressed to A. C. Burnham at his residence, Champaign, Illinois, of date January 17, 1888, there are contained these statements: " We have arranged for a ninety days'

extension on the $25,000 note due at the Chemical Nat'l to-day. * * * The frequent calling for papers at the east is materially affecting our business, and, doubtless, in a measure is the reason of calling in of funds. In December we sent back quite a large amount. The business is practically at a standstill, and what we did in December and January will not pay expenses. We deem it advisable to acquaint you with this condition." The extension above arranged with the Chemical National Bank, it will be noted, expired after the middle of April, 1888. Before this extended loan fell due there were sent out circular letters, of which the following is a sample:

"A. C. Burnham.      L. W. Tulleys.      J. N. Brown.
"OFFICE OF BURNHAM, TULLEYS & CO.,
"COUNCIL BLUFFS, IOWA, April 2, 1888.

"*Alfred Walker & Co., Farm Loans and Real Estate, 85 Orange St., New Haven, Conn.*

"Realizing the advantage of permanence and perpetuity in a business conducted under a corporate form, the American Mortgage & Trust Co. has been organized under the laws of the state of Iowa, to succeed the old and well known firm of Burnham, Tulleys & Co., which has been placing western farm mortgage loans for more than twenty-five years, and has now many millions upon its books. The proposed capital is $500,000, a large part of which has been taken by ourselves. If it were practicable we should take it all, as from our past experience in the business we feel sure it will be a profitable investment. We offer a limited amount of stock to our friends at par and fifty cents per share. Under our articles of incorporation and the laws of this state the stock is full paid and non-assessable. The company will be under the management of the members of said firm, and will adhere to the same conservative methods which have characterized their past record. It needs no argument to demonstrate the value of our plant or that the stock will pay handsome

dividends. The new form will increase our facilities, both east and west, for a. more extended business, and with a larger business will come increased profits. As the amount we have to dispose of is limited, we offer it to all our friends and customers, and subscriptions will be accepted in the order of the priority of their receipt. Subscriptions should be accompanied by twenty-five per cent of the amount subscribed. The balance will be called in between now and June first, as the directors may elect. As soon as the amount to be sold is taken we reserve the right to reject subscriptions in excess."

Almost immediately after the incorporation of the American Mortgage & Trust Company it was found advisable to adopt an additional distinctive designation, and the result was the incorporation of the Anglo-American Mortgage & Trust Company. Neither party questions that this change was simply for the purpose indicated and all concede the substantial identity of these corporations. From the deposition of L. W. Tulleys we learn that up to June 1, 1888, or thereabouts, when the firm of Burnham, Tulleys & Co. was succeeded in business by the corporation last above named, the capital stock of said firm was owned by A. C. Burnham. It is not very clear just what is meant by this statement, but we assume that Burnham alone had advanced the funds necessary for carrying on the business of said firm. For whatever this interest may have been, it was arranged between Mr. Burnham and his partners, Tulleys, Brown, and McDowell, that they should give to him their notes to the amount in the aggregate of $100,000. There had been earned by the firm of Burnham, Tulleys & Co. about $140,000, which was evidenced by commission mortgages, book accounts, taxes advanced, and foreclosure expenditures made, etc. Of this amount $40,000 in par value was the distributive share of A. C. Burnham. When he took the notes of his partners in exchange for the stock of Burnham, Tulleys & Co. they as-

signed their share of the $140,000 profits above referred
to ($100,000) to Mr. Burnham as collateral security to
their aforesaid notes. From the evidence ·as an entirety,
and from the assertion of counsel for appellant that Burn-
ham was worth a million, when he contends that Burn-
ham, Tulleys & Co. were not insolvent, in connection
with his failure to mention in that connection what finan-
cial standing Burnham's partners had, it is difficult to
avoid the conclusion that just at this point of time the
only solvent member of the firm of Burnham, Tulleys
& Co. went out of the farm loan business. In the contract
whereby was assigned the above collaterals it was stipulated
between Mr. Burnham and his partners that the com-
mission notes turned out as collateral should remain with
Tulleys, Brown, and McDowell for collection without ex-
pense to Burnham, and that the said collections should be
applied on the notes to which the notes so entrusted were
collateral, when the aggregate collections so made amounted
to five or ten thousand dollars. By this arrangement there
were placed in the hands of Tulleys, Brown, and McDow-
ell assets of the nominal value of almost $100,000. Of this
amount Mr. Tulleys testified that $66,000 was made up of
mortgages, the remainder was composed of tax certificates,.
notes, etc. In order to make up the even $100,000 there were
required between three and four thousand dollars, of which
Mr. Burnham put up his share in cash; his partners made
their notes to the Anglo-American Mortgage & Trust Com-
pany for their proportion. In this manner, as we understand
it, were L. W. Tulleys, J. N. Brown, and J. V. McDowell
provided with means wherewith to pay for $100,000 of the
stock of the projected mortgage and trust company. These
gentlemen were not satisfied, however, with this $100,000
subscription. ·They took stock in addition to the amount of
$100,000 par value and paid for it in the good-will of the
firm of Burnham, Tulleys & Co. It is possible that herein-
before we were mistaken in assuming that the capital stock

of the firm of Burnham, Tulleys & Co. owned by Mr. Burn-
ham, and transferred to his partners, included this good-will.
For this our mistake, if such it was, we can offer only the
apology that in no transaction preceding the exchange for
stock, of this good-will, was it at all mentioned—most cer-
tainly it was not in the circular letters issued April 2, 1888.
Against these subscriptions for $200,000 of capital stock
there were stock subscriptions by eastern parties for about
$110,000 at par value, for which payments were made in
cash, and this last amount in fact constituted the entire as-
sets of the Anglo-American Mortgage & Trust Company
available in the business for which it was incorporated.

After the organization of the Anglo-American Mortgage
& Trust Company its management was entrusted to Tulleys,
Brown, and McDowell, as its officers.   Indeed, in view of
the amount of stock held by them, this could not have
been otherwise intended.   On December 7, 1888, J. V.
McDowell, secretary of this mortgage and trust company,
wrote to its vice president asking his advice as to making
a dividend of three and one-half per cent on its capital
stock.   With this letter a statement of the condition of the
corporation was submitted, in which there was mentioned
not a single cash item, unless the term "interest, $1,-
120.39," amounted to such mention.   The affairs of the
corporation under the management of L. W. Tulleys, presi-
dent, J. V. McDowell, secretary, E. H. Walters, treas-
urer, and J. N. Brown, vice president (the latter residing
in New York), grew worse and worse.   It is not shown
how the change of the directory and the managing officers
of this corporation was brought about, but it had become
practically an assured fact in November, 1891.   The affairs
of the mortgage and trust company were then in such a con-
dition that the stock which had actually been paid for in
cash at par was scaled down fifty per cent.   Messrs. Tul-
leys, Brown, and McDowell at the same time, and as part of
the same transaction, gave up the stock which had been is-

sued to them in consideration of the good-will of the firm of Burnham, Tulleys & Co. While trouble was brewing in the fall of 1891, Mr. Burnham, upon the suggestion of one or more of the managing officers of the mortgage and trust company, withdrew the collaterals which he had received from Tulleys, Brown, and McDowell and entrusted them to Mr. Hesse, with instructions to keep them in certain safety deposit vaults named by Burnham. About January 22, 1892, Edward H. Walters, treasurer, and John V. McDowell, secretary of said mortgage and trust company, entered into a conspiracy with L. W. Tulleys, its president, in pursuance of which said Walters and McDowell filed in the circuit court of the United States for the district of Nebraska a bill in equity, the object and prayer of which was to have appointed a receiver to wind up the affairs of the Anglo-American Mortgage & Trust Company, of which the place of business then was, and since August 1, 1888, has been, in Omaha. L. W. Tulleys, as president of said company, entered its voluntary appearance, and on its behalf consented in writing to the appointment of a receiver as prayed. Upon application to the same court the affairs of the company were taken out of the hands of this receiver April 10, 1892, on account of the collusion whereby his appointment had been brought about. (*Vide Walters v. Anglo-American Mortgage & Trust Co.*, 50 Fed. Rep., 316.) Mr. Tulleys, after the appointment of the aforesaid receiver, continued to be the president of the Anglo-American Mortgage & Trust Company, until the annual meeting of the stockholders about June 1, 1892. From the commencement of the corporate existence of the mortgage and trust company the real estate securities were taken in the form of trust deeds, in each of which L. W. Tulleys was named as trustee. On account of the necessity of using some blanks on hand at the time of the incorporation of the mortgage and trust company until new blanks could be prepared, the name of Clarence

K. Hesse was retained as beneficiary in the trust deeds.
After proper blanks for the purpose had been obtained,
and thenceforward, the name of the Anglo-American Mort-
gage & Trust Co. was substituted for that of Mr. Hesse as
beneficiary. It was explained by Mr. Tulleys in his deposi-
tion that this use of trustee and beneficiary was for the pur-
pose of enabling transfers of the secured bonds simply by
the blank indorsement thereof by the beneficiary, who was
therefore presumably the payee named in each bond. This
method of doing business had the disadvantage that it
required in ordinary transactions that Mr. Tulleys should
execute a release whenever a loan was paid off. In his depo-
sition Mr. Tulleys testified that the mortgage and trust
company in the fall of 1891 decided to do nothing more
than wind up the business on hand. From this indefinite
time thus named Mr. Tulleys is shown to have refused to
execute releases as required upon payment of each loan, but
to have insisted as a condition precedent, in some cases, that
the commission mortgages made to Burnham, Tulleys & Co.
should be paid by the holder of the bond, or, in other cases
where by foreclosure Mr. Tulleys had acquired the abso-
lute title to the land conveyed as security to him as trustee,
that the deficiency judgment existing should be assigned as
he directed, etc. In every instance of foreclosure the entire
expense thereof was, by President Tulleys and his associate
officers in the management of the Anglo-American Mortgage
& Trust Company, charged to that company, although the
most, if not the entire benefit thereof, accrued to the holders
of the mortgages which had been made to Burnham, Tulleys
& Co. Mr. Tulleys, in his deposition, avowed that he refused
to execute releases or conveyances without the claims origi-
nally held by Burnham, Tulleys & Co. being provided for,
"because," he said, "I considered myself trustee for the
holder of the first mortgage and trustee for Burnham,
Tulleys & Co." From these considerations it is quite evi-
dent that Mr. Tulleys, from the time he foresaw that his

control of the Anglo-American Mortgage & Trust Com-
pany's affairs must soon cease, acted in the interest of the
holders of the second mortgages without regard to the
rights of the corporation of which he was president, and
that his position of trustee enabled him to do this effect-
ively. At the same time he was not unmindful of his
own individual interests and future prospects, as is evident
from the testimony of E. H. Walters. This witness testi-
fied that he was elected treasurer of the Anglo-American
Mortgage & Trust Company in June, 1889, from which
date he was also a director of said company; that when
the receiver was appointed the commission notes, which
meantime by order of Mr. Burnham had been by Mr.
Hesse turned over to Tulleys, McDowell, and Walters,
were taken by this witness to Council Bluffs, Iowa, where
such as are unpaid still remain; that when the receiver
was appointed, about January 22, 1892, Mr. Tulleys, presi-
dent, left the office of the mortgage and trust company,
and that seven days before this time witness had left said
office. When pressed as to having taken steps looking to
the organization of a business in Council Bluffs this witness
very guardedly answered and repeated that there were no
such steps taken prior to the date at which he severed his
connection with the company. He also admitted that
after his employment by the mortgage and trust company
had ceased, he secured information from the mortgage and
trust company's books, which was afterwards used by Mr.
Tulleys and himself, under the name of "L. W. Tulleys,
trustee;" that immediately after this witness left the mort-
gage and trust company's employment, he and Mr. Tul-
leys commenced corresponding with investors and got
orders from them to take charge of their business. This
was done at Council Bluffs, Iowa, under the name of "L.
W. Tulleys, trustee." There are embodied in the bill of
exceptions several letters which need not be further de-
scribed, for their object has already been sufficiently indi-

cated by the testimony of the witness just referred to.    As early as June 6, 1891, the bank account of the Anglo-American Mortgage & Trust Company with the Omaha National Bank was discontinued in that name, and thenceforward stood in the name of "L. W. Tulleys, trustee." There are several other matters that might be adverted to which illustrate the methods and purposes of the plaintiff in this action, but time and space forbid further reference to them.    It is sufficient to say that they illustrate the same purposes attempted to be accomplished by the same means as have already been described.    After Mr. Tulleys and his associate, Mr. Walters, had embarked in business in Council Bluffs, there were remittances received at the Anglo-American Mortgage & Trust Company's office in its line of business, which were payable to "L. W. Tulleys, trustee."    These were indorsed by the manager of the affairs of the mortgage and trust company with the name of "L. W. Tulleys, trustee" and collected for said company. In various other ways the right of Mr. Tulleys to use the designation "L. W. Tulleys, trustee," was denied and prevented by the Anglo-American Mortgage & Trust Company in respect to its business matters.    This Mr. Tulleys resented, and to prevent its continuance he commenced this action for the relief hereinbefore indicated.

It is obvious from an examination of the petition that no relief was sought in respect to such indorsements of the name of "L. W. Tulleys, trustee," as had already been made; indeed, this would be out of the question, for Mr. Tulleys does not claim that there had been misappropriated funds owned by him.    The injunction sought was in effect to restrain this mortgage and trust company from transacting its own business.    This officer, who has been recreant to his duties and who has sought to misappropriate that good-will of a corporation, for which in his official capacity he had formerly been an instrumentality in procuring to be paid the sum of one hundred thousand dollars,

now has the hardihood to ask a court of equity to assist
him in the further betrayal of his trust. He, with appar-
ent sincerity, claims that in the designation "L. W. Tul-
leys, trustee," he has a sole proprietary right, which the
courts are bound to protect, irrespective of all other con-
siderations. The word "trustee" itself excludes the idea of
proprietorship therein for his own sole benefit. It indicates
that he is acting in a trust capacity, which fact of necessity
implies the existence of a beneficiary, and the proofs con-
clusively show that that beneficiary was and still continues
to be the Anglo-American Mortgage & Trust Company.
It is the province of a court of equity to enforce trusts of
this character rather than to render them nugatory. It is
insisted by appellant, however, that not even a court of
equity has jurisdiction to decree in favor of one party the
right to use the name of another. It is not necessary to
consider what jurisdiction the district court might have
possessed if the mortgage and trust company had brought
original action for the same relief as was prayed in its
answer. By invoking in aid of his alleged exclusive pro-
prietary interest in the designation "L. W. Tulleys,
trustee," the powers of a court of equity, the appellant
waived the right to question that court's jurisdiction to
administer complete equity between the parties litigant as
to the subject-matter involved. (*Swift v. Dewey*, 20 Neb.,
107; *Buchanan v. Griggs*, 20 Neb., 165.) In *Sherwin v.
Gaghagen*, 39 Neb., 238, it was said: ".The rule is that
where the party, having the right to object, voluntarily
submits to the jurisdiction of a court of equity, the cause
will be retained for trial on its merits and the proper relief
awarded." The answer of the Anglo-American Mortgage
& Trust Company, in the nature of a cross-petition, in
effect prayed that Lysander W. Tulleys, the plaintiff,
should be enjoined from a misuse of the designation "L.
W. Tulleys, trustee," to his own advantage, and that, as a
member of the firm of Burnham, Tulleys & Co., he should

be restrained from a misuse of the said trusteeship for the benefit of the firm last named to the disadvantage of the Anglo-American Mortgage & Trust Company, and that, by conveyances to be ordered by the court, such abuses as had already been perpetrated in the name of "L. W. Tulleys, trustee," should be corrected. This was in relation to the same subject-matter as was presented by Tulleys in his petition, and the decree conformably to the prayer of the answer was within the rule above laid down. It follows that the judgment of the district court is

AFFIRMED.